UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

M NICOLAS ENTERPRISES, LLC d/b/a          §
WORLD WIDE HEALTH SERVICES, *a*           §
*Florida Limited Liability Corporation*, **and**     §          Civil Case No.:
MICHELLE NICOLAS, *individually*          §
*and as President,*                        §
                                           §
                                           §
               Plaintiffs,                 §
                                           §          **DEMAND FOR JURY TRIAL**
vs.                                        §
                                           §
DEPARTMENT OF VETERANS AFFAIRS,            §
                                           §
               Defendant.                  §
                                           §

## COMPLAINT

Plaintiffs M Nicolas Enterprises, LLC d/b/a World Wide Health Services ("WWHS") and

Michelle Nicolas ("Nicolas"), by and through their counsel, Scott Hirsch Law Group, PLLC and

Rodriguez Law & Advocacy, P.A., bring this lawsuit pursuant to 42 U.S.C. § 1981, and Florida

common law, and respectfully request this Court issue an award granting Plaintiffs compensatory

damages, pre-judgment interest, post-judgment interest, attorneys' fees and costs.

## INTRODUCTION

1.     As detailed below, the Department of Veterans Affairs ("VA") engaged in overt

acts of racial discrimination against the Plaintiffs, an adult day care facility and its sole proprietor

an African American woman, who simply wanted to contract with the VA to provide needed day

care services to this nation's veterans.  The acts of the VA towards the Plaintiffs were facially

discriminatory, reckless, and outrageous.

2.      Racial discrimination is the only plausible explanation for the VA's refusal to contract with Plaintiffs, as will be explained in detail below the VA, and specifically the West Palm Beach, Florida region has a long and detailed history of discriminatory practices.  Indeed, not a single minority owned business has been awarded a contract solicitation from the VA in the West Palm Beach region from 2008 to the date of the filing of this litigation.[1]  Moreover, the contract solicitation at issue was awarded to a facility that was not superior to Plaintiffs and happens to be operated by whites.  What is especially is disturbing is that, upon information and belief, the awarded facility was not required to undergo the same inspections and scrutiny WWHS had to.  Nor was this facility instructed by the VA to purchase a $10,000.00 additional fire safety system to continue the solicitation process, and which was contrary to any written requirement of the solicitation.

3.      The VA's discrimination and outrageous conduct is contrary to the law.  Racial discrimination in contracting is prohibited by 42 U.S.C. § 1981, which ensures that all people have the same right to make and enforce contracts "as is enjoyed by white citizens."  Section 1981 was enacted to eradicate racial discrimination in contracting and is derived from the Civil Rights Act of 1866 and applies with full force today.

4.      Through this lawsuit, Plaintiffs seek to vindicate their rights under 42 U.S.C. § 1981.

---

[1] For the fiscal year 2008 to 2018 for the entire State of Florida, a total of 123 VA contracts have been awarded to adult daycare centers (NACIS624120).  Out of those 123 contracts, only 6 were awarded to minority owned business. Those 6 contracts were awarded between September 28, 2018 through November 14, 2018.  A comparison of the awards for those 6 contracts reveals lower amounts awards then the non-minority owned awardees.  Out of the 123 total awards, 13 have been in the Palm Beach County region. None of the 13 awards in Palm Beach County have been to minority owned businesses.  *See* www.usaspending.gov

## PARTIES

5.      Plaintiff, WWHS is a minority owned Florida Limited Liability Corporation, with its principal place of business located in West Palm Beach, Florida.

6.      Plaintiff, Nicolas, is the owner and President of WWHS, and is African-American. Nicolas is a resident of West Palm Beach and is otherwise *sui juris*.

7.      Defendant, VA is a governmental entity organized in and regularly conducts business in West Palm Beach, Florida.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter as a federal question pursuant to 29 U.S.C. § 1331, as this matter is being brought under a federal statute, specifically, 42 U.S.C. § 1981.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(a)(2), as this case involves allegations and damages arising out of an implied contract, for which damages do not exceed $10,000.00.

9.      Venue is proper in the United States District Court in and for the Southern District of Florida pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

10.      In January 2018, after witnessing a homeless veteran rummaging through a dumpster, Ms. Nicolas, through her facility WWHS, which was licensed to provide adult day care services through the State of Florida, applied to provide services to veterans under Solicitation VA248-17-R-0713.

11.      Solicitation VA248-17-R-0713 (the "Solicitation") was an open and continuous solicitation to provide community adult day care services at contractors' facilities under indefinite

3

delivery contracts.  The Solicitation anticipated multiple awards made on an as needed basis.  The Solicitation invited proposals from contractors in the NCO 8 region, which included West Palm Beach, Florida.

12.     On January 29, 2018, Nicolas submitted her application for the Solicitation in accordance with the provided instructions.[2]  Thereafter, on February 2, 2018, Nicolas received a call from VA NCO 8 Contract Specialists Johnathan Locklear that West Palm Beach VA ("WPB VA") had identified a need for WWHS to provide services under the terms of the Solicitation.

13.     Nicolas was informed by Mr. Locklear that WPB VA would be notified to set up an inspection of WWHS, and that once the inspection completed and approved the VA could finalize the contract under the Solicitation.  Mr. Locklear expressed to Nicolas, in regard to the inspection, "I think that if you have passed all the stuff that the State does, you should be good." "If you are passing the State safety inspection, I would argue you are safe." Mr. Locklear further stated to Nicolas, "We can start working the contract once you know you passed the inspection…Congratulations…If you get this done you are locked in for five years."

14.      On February 6, 2018, Ms. Nicolas was contacted by Charlene Crace, the WPB VA Community Programs Supervisor. Nicolas explained her facility to Ms. Crace and sent to her copies of WWHS facility's license, capacity approval, Medicaid license, and prior approved inspections for State of Florida, ACHA, West Palm Beach Fire Department, and West Palm Beach Code Enforcement.  Ms. Crace informed Nicolas that the first step would be to schedule an inspection with the WPB VA inspection team.

15.     Despite multiple requests to the WPB VA office for an inspection appointment, it

---

[2] Although the West Palm Beach office for the VA handled the inspection and approval of contractor, the Solicitation was administrated out of the VA Tampa office.

was not until March 6, 2018 that Ms. Nicolas received a phone call from WPB VA employee Kathy Frazier regarding the inspection.  Ms. Frazier informed Nicolas that, according to her notes WWHS had already been inspected and had passed the inspection.  Thereafter, on March 12, 2018, Nicolas again received a call from Ms. Frazier, who now informed her that an inspection would occur at WWHS on March 15, 2018.

16.     The March 15, 2018, inspection of WWHS was conducted by WPB VA employee Michael Lettera.  As part of the inspection, Mr. Lettera reviewed WWHS safety procedures and other office documents, including WWHS's Emergency Quick Code Reference Sheet. Mr. Lettera toured the facility, accompanied by Nicolas who was taking notes.  Mr. Lettera informed Nicolas that aside for a few minor items that need correcting, "everything looks good."  Mr. Lettera stated that he wanted to get more information concerning whether there was a need for additional fire equipment at WWHS, as the building already had a fire system and an additional system is usually for nursing homes.  Otherwise, as Mr. Lettera informed, if all the minor deficiencies were taken care of, he would not have to return.  Based upon the notes Nicolas took, she immediately went to a home improvement store to purchase the items needed to correct the deficiencies.

17.     On March 23, 2018, Nichols Received an email correspondence from WPB VA employee Charlene Crace stating the March 15, 2018 WWHS inspection identified some deficiencies and that Plaintiffs had until April 21, 2018 to submit a Plan of Corrective Action to the West Palm Beach Community Program Office.  The email contained a Microsoft Word document attached representing to be the March 15, 2018 Inspection Report for WWHS conducted by Mr. Lettera.

18.     The inspection report's description of WWHS itself was contradictory to the actual site itself.  The report erroneously refers to WWHS having a "sleeping room."  This is in fact not

accurate, as was well known to Mr. Lettera during his inspection.  Ms. Nicolas clearly explained to Mr. Lettera during the inspection that room is a "quiet room" which is rarely used by WWHS clients.  Moreover, all that is housed in that room is recliners.  Ms. Nicolas further explained that the clients are never in that room without staff present.  Otherwise, clients are housed in one room during hours of operation.

19.     The inspection report identified ten (10) deficiencies, most of which were minor items that Ms. Nicolas corrected immediately based upon the notes she took during the inspection. One particular deficiency stated as follows:

> Due to clientele and occupancy type, a fire alarm system is required and shall include manual means of activation as well as smoke detection in accordance with N.F.P.A 101 9.6 and maintained in accordance with N.F.P.A 72.  **See 3-6 to 3-10 and 4-2.   Recommend seeking 3rd party to meet requirements of the fire alarm system.**  Emphasis in the original[3]

20.     This specific deficiency was in fact contrary to the applicable life safety code in effect at the time, and  was completely unnecessary given the fact that WWHS day care occupants were housed in one room, and the occupancy approved by the WPB VA was 30, not 100 as required under the Life Safety Code to necessitate a fire system as being required by the WPB VA. Notwithstanding, the report clearly stated that "This facility is **recommended for placement pending corrective action"** of the stated deficiencies.  (Emphasis in the original).

21.     Thereafter, on March 27, 2018 Nicolas sent to Ms. Crace via email, documentation and proof that all deficiencies, other than the requirement for an additional fire alarm system, were

---

[3] The inspection report clearly references the of the operative Life Safety Code NFPA 101-2015 which states in pertinent part: "Day Care occupancies housed in one room are not required to have a fire alarm system."; "In day-care occupancies housed in one room or those housing clients capable of self-preservation where no sleeping facilities are provided, smoke detection is not required."; "For daycare occupancies with not more than 100 clients, emergency forces notification is not required."

fully addressed and corrected. Nicolas requested further clarification concerning the fire alarm deficiency, as her facility does not house more than 100 day care clients, nor are they housed in a more than one room.   Additionally, Ms. Nicolas explained that after speaking to the local city fire department official, she was informed that the WPB VA safety inspector's findings are contradictory, as the fire alarm requirement stated by the inspection report does not appear to be a requirement for WWHS under the applicable life safety codes.  Moreover, the official informed Nicolas that, as the building already had a fire system in place, an additional system may cause confusion and be dangerous for first responders.  Nicolas therefore requested clarification as to the application of the requirements and the stated fire alarm deficiency as it related to WWHS.

22.     In response to her request for clarification, on March 28, 2018 Ms. Crace sent Nicolas an email informing her that WWHS would not be moving forward in the solicitation process.  The reason cited by Ms. Crace was completely contradictory to the factual situates of WWHS, which housed its day care clients in a single room, did not have a separate sleeping room, did not have occupants exceeding 100, and all clients were capable of self-preservation.  Despite that fact, which the WPB VA was clearly aware of, Ms. Crace was denying Plaintiffs ability to move forward on the Solicitation.  This action was contrary to Ms. Crace's prior letter which allowed Plaintiffs to correct all stated deficiencies by April 21, 2018.

23.     Nicolas explained to Ms. Crace that she just was looking for clarification as to what the WPB VA was requiring as she was getting conflicting information.  Nicolas further explained that she intended to follow the WPB VA's insistence that she get an additional fire alarm system so as to comply with the WPB VA's requirement to be cleared for the Solicitation and was in the process of speaking with a third party provider, specifically ADT, for the additional fire alarm system.

24.     Notwithstanding, Ms. Crace simply told Nicolas that she understood this rejection of Nicolas' proposed correction was "hard news." However, "[t]he VA CADHC team cannot continue the contracting process for World Wide Health Services for this year, however you will have an opportunity to complete the recommendations for next year." This flippant rejection of Plaintiffs was made even though the terms of the Solicitation did not close until May 26, 218, and once applied for the VA allowed 180 days to complete the terms of the contract. Simply stated there was no legitimate reason that Ms. Crace was denying Plaintiffs proposed correction, epically since the proposed correction was exactly what the WPB VA was requesting.

25.     After receiving this series of communications and the rejection from Ms. Crace, Nicolas forwarded the email correspondences to VA employee Rodney Cassidy in Tampa, who was the senior contracting officer and named contact for the Solicitation. Nicolas explained to Mr. Cassidy that she did not understand the position Ms. Crace was taking and why. Nicolas was looking for his clarification and assistance. Nicolas eventually connected with Mr. Cassidy telephonically. During the conversation, Mr. Cassidy informed Nicolas that the denial from Ms. Crace was sent in error, and Ms. Nicolas should disregard it and continue to move forward with the Solicitation. Mr. Cassidy further informed Nicolas to continue to speak with ADT concerning addressing the fire alarm deficiency which was identified as item number 8 on the inspection report. Thereafter, Nicolas sent an email to Mr. Cassidy informing him that she needed clarification as to specifically what the WPB VA needed for her to satisfy the stated fire alarm deficiency, as she was getting conflicting information and she already had smoke detectors throughout her facility, as was identified by the inspection report. She just needed clarification so she could fully comply in a timely manner with what was being required of her.

26.     On April 2, 2018, still trying to get clarification on what WPB VA specifically

8

needed of her with respect to the fire alarm system deficiency, Nicolas spoke with Mr. Lettera.  He informed Nicolas that he had never been provided with her submissions correcting the deficiencies listed in the inspection report he drafted, or her requests for clarification with respect to the fire alarm system.  Mr.  Lettera informed Nicolas that he would need the information she sent directly from Ms. Crace, and that he was not able to receive any information or correspondence from Ms. Nicolas, as everything he received had to come from Ms. Crace.  Thereafter, Nicolas received via U.S. Mail an undated and signed letter form Ms. Crace on WPB VA letterhead, which contained an exact recitation of the denial that was previously sent to Nicolas on March 28, 2018.   Nicolas contacted Mr. Cassidy and was again informed to disregard the denial letter from Ms. Crace and to cease all further communication with the WPB VA office.

27.     In response to her requests for guidance as to what specifically was needed for the fire alarm system, Nicolas received an email for Mr. Cassidy on April 3, 2018.  In the email Mr. Cassidy acknowledged the time limitations Nicolas was facing with ADT and specifically advised, "I would go ahead and put in the smoke detection (smoke alarms). If you are already in compliance with State requirements as far as the requirement for a fire alarm system. I do not foresee you have any problems when you have your reinspection…You have done everything that has been asked of you."  Apparently, what Nicolas did not know at the time was that it did not matter what she did, it would never be good enough for the WPB VA to approve her for the Solicitation.

28.     On April 16, 2018, Nicolas received a call from another local West Palm Beach adult day care facility, Faith Lutheran Church of North Palm Beach d/b/a New Day Adult Care Center ("New Day").  Julie Tombari the facility administrator stated to Ms. Nicolas that she informed Nicolas was applying for the Solicitation and that she wanted to know how Nicolas was completing the proposal.  Ms. Nicolas was a little taken aback that she knew WWHS was

9

competing for the Solicitation, as this information was supposed to be confidential.  After speaking with Ms. Tombari, Nicolas contacted Mr. Cassidy to inform him of the call.  As Mr. Cassidy was out of the office, Ms. Nicolas was instructed to contact Mr. Locklear.  Ms. Nicolas forwarded her concerns concerning the phone call from New Day to Mr. Locklear.   Ultimately, what Ms. Nicolas did not know, and did not find out until recently, is that New Day was awarded under the Solicitation on or about September 27, 2018.

29.     On April 23, 2018, Nicolas forwarded a copy of the contract for the installation of the fire alarm system equipment in accordance with the stated deficiencies in the inspection report. The cost of the fire alarm system was $10,000.00.  In addition, Ms. Nicolas sent pictures of the fire alarm system currently in place in her facility as well as pictures of the smoke alarms placed throughout the facility, as she still had not received clarification as to this issue.  The WPB VA kept insisting that she have smoke detectors in every room in her facility, yet that is exactly what she had.

30.     On May 7, 2018, Nicolas emailed an executed copy of the ADT contract to Mr. Cassidy.  The contract was for the fire alarm system as required by the WPB VA.  Thereafter, Mr. Cassidy informed Nicolas that he would forward the contract to Mr. Lettera for review to ensure nothing additional would be required.

31.     On May 23, 2018, Mr. Lettera sent an email to Mr. Cassidy stating that Plaintiffs needed one more item to satisfy their stated deficiency. WWHS still needed to install additional smoke detectors, despite already having smoke detectors throughout the facility.  Essentially, what the WPB VA was requiring is that Nicolas install smoke detectors next to already installed and functional smoke detectors.  Despite the absurdity of the requirement Nicolas added the redundant smoke detectors to the WWHS ADT contract, to ensure she was in full compliance with the WPB

VA's directives, and so she could move on with the Solicitation.[4]

32.     On June 22, 2018, Nicolas, after spending $10,000.00 at the insistence of the VA, sent photos and other supporting documentation confirming the fire alarm system has been installed.   Six days later, Nicolas received an email from Mr. Cassidy stating, "This is to confirm that your fire inspection plan 3-15-2018 has been satisfied…"   Mr. Cassidy's email further indicated that now a second inspection of WWHS would be scheduled and conducted by the local WPB VA.

33.     Over a month later, on July 24, 2018, two inspectors from the WPB VA came to reinspect WWHS.  Again, the inspectors were provided all the required documentation and Nicolas accompanied them to answer any questions that arose.  The inspectors requested copies of WHHS prior State of Florida inspections and proof of corrected inspection deficiencies.  Nicolas also provided documentation from the State of Florida that evidenced that there were no deficiencies since June 29, 2017.  The inspectors left with little to no guidance as to their findings provided to Ms. Nicolas.

34.     On August 7, 2018, Nicolas contacted Mr. Cassidy requesting update regarding status of the Solicitation and the results of the July 24, 2018 inspection.  Nicolas raised concern over the lack of communication she was receiving and inquired if what transpired was proper protocol.  Mr. Cassidy stated that Ms. Nicolas had a "unique situation," and that never in the history of the contracting office has anyone gone through what Nicolas had to endure. Mr. Cassidy then advised Nicolas that if she felt she was not being treated fairly that she could seek further redress

[4] The absurdity of the requirement and what can only be seen as discriminatory conduct is the fact that, despite knowing and documenting that WHHS had installed smoke detectors throughout, the WPB VA sent emails to Tampa VA stating that WHHS did not have smoke detectors.  All along Nicolas kept requesting clarification as to what was needed, as none of it made any sense.  All she received in return was silence and more hoops to jump through.

with her congressional office, as there was not much the contracting office could do if the WPB VA was not responding. The conversation then took a different turn and Mr. Cassidy stated to Nicolas that it "may be the color of your skin" as to why she was facing such difficulty with the WPB VA.  Taken aback and furious Ms. Nicolas went to the congressional office of the Honorable Alcee L. Hastings and filled out all the necessary paperwork for Congressmen Hastings's office to inquire of the VA what transpired with the Solicitation.   Congressmen Hastings's letter of inquiry was sent to the VA.  Nicolas also provided the documents to Mr. Cassidy as requested.

35. On August 8 2018, Nicolas received an email from Mr. Cassidy.  Attached was a letter signed by VA Contracting Officer Yamil Rodriguez.   In the letter Ms. Rodriquez stated that the WPB VA does not recommend WWHS for approval of the Solicitation contract.  The letter listed a series of new factors of deficiency, enumerated by bullet point, as well as the exact same factors that the VA had stated that were corrected and approved on June 22, 2018.  Frustrated, and knowing the stated deficiencies were incorrect, Nicolas immediately sent an email to Mr. Cassidy as instructed by Ms. Rodriguez.  In the email to Mr. Cassidy, Nicolas sent video of all the supposed deficiencies and addressed each one in written form, disproving their accuracy. Moreover, the deficiencies listed were not requirements identified in the terms of the Solicitation.   Nicolas also expressed her frustration with the fact that she was now being denied on deficiencies the VA had said were satisfactorily resolved, after Nicolas was required to spend $10,000.00 installing a fire alarm system that was contrary to applicable Life Safety Code.

36. In response to Nicolas' videos and email, Ms. Rodriquez responded stating that Ms. Nicolas had "more than a fair opportunity," and was given two inspections, despite the fact that only one was required by the terms of the Solicitation and admitted to by Ms. Rodriguez.  Ms. Rodriquez stated that the denial was based upon the second inspection and requested until August

12

27, 2018 to respond to Nicolas's inquiry.  Ms. Rodriguez told Nicolas that if she wanted a copy of the second inspection that she would have to submit a Freedom of Information Act request.  This was completely contradictory to how the VA had previously operated, as they readily provided Nicolas a copy of the first inspection without the necessity of a FOIA request.

37.     After a series of emails back and forth with Ms. Rodriguez concerning the amount and accuracy of the information, she had to base the denial of Plaintiffs the contract, Nicolas was contacted by Darryl Majors, Division Chief of NCO 8 in Tampa.  Mr. Majors recognized Ms. Nicolas's frustration and informed her that he has instructed Ms. Rodriguez to investigate the issues she has raised concerning the second inspection and denial of the Solicitation.  He again requested time to complete such an investigation.[5]

38.     On August 17, 2018 Mr. Majors sent an email to Nicolas stating that after "researching" the Solicitation apparently omitted incorporation of Handbook 1147.1.  Mr. Majors attached a Microsoft Word document that purported to be Handbook 1147.1. However, this attachment appeared to be a draft or incomplete document, far from an official Government Handbook that is to be relied on by the public.   Moreover, the attachment contained references in red colored font to insert information that was not present.  The attachment also made references to the State of Minnesota, and Minnesota specific information.  Finally, inspecting the author of the document as identified by the file, it appears to be created by VHAMINRossbV.[6]

39.     Nicolas requested from Mr. Majors where she could obtain an official copy of Handbook 1147 as what he sent did not appear to be complete and further that she could not locate

---

[5] At no time has Nicolas received a formal document stating she was not the awardee under the Solicitation and that the Solicitation has been awarded to another as is required.

[6] It is a logical assumption that the MIN in the author's designation is a reference to Minnesota, in keeping with the references to Minnesota throughout the document.

said Handbook at any official government site.[7]  In response Mr. Majors stated that he was waiting for response from the author of the Handbook, and that he has asked his office to verify the document he provided as Handbook 1147.1 was "actually the current publication" and  "is this information publicly available and if yes where would someone go to obtain the publication".[8]

40.     Not having received a response from Mr. Majors with respect to Handbook 1147.1, Nicolas called and emailed the VA in Washington D.C. and was eventually put in touch with Daniel Schoeps who was directly involved in the publications concerning Geriatrics and extended care, which included adult day care.  Nicolas inquired via email if Handbook 1147 was available and if it was a public document.  In response, Mr. Schoeps informed Nicolas that he had checked the VA's library for Handbook 1147 and "[t]here is no such document published by the VA." Nicolas emailed the document Mr. Majors represented to be Handbook 1147.  To which Mr. Schoeps replied, "I recall this draft document.  It was never published." Mr. Schopes further stated with respect to the attachment Mr. Majors sent to Nicolas, "the draft document is not a reliable source at this point. We don't have a draft that we can share with you at this time."  Nicolas thereafter informed Mr. Majors of what she learned concerning Handbook 1147.1.

41.     On August 29, 2018, Nicolas received an email from Mr. Majors containing a cursory explanation as to the basis of the denial for the Solicitation.  The information contained in the explanation did not address any of Nicolas' questions and instead was filled with factually

---

[7] Handbook 1141.03, titled Adult Day Health Care is specifically referenced by the Solicitation as being the applicable Handbook.  As of the present date, Handbook 1141.03 is still in effect and accessible from
https://www/va/gov/vhapublications/ViewPublication.asp?pub_ID=2086

[8] One would expect a government official in Mr. Majors position to know if a particular Handbook, that is supposed to be incorporated into and determinative for a contract solicitation, is current, publicly available, and where it can be obtained by said public.

inaccurate reasons to justify the denial factors.  Nicolas immediately sent a response to Mr. Majors detailing the inaccuracies.  Rather then address them, Mr. Majors simply sent back the same document he had originally sent.

42.     Thereafter, Nicolas was put in touch with Dennis Bleckley, VA Deputy Director of Contracting for NCO 8.  Nicolas explained the situation, including her concerns of discrimination.  Mr. Bleckley told her to send him in writing the questions she wanted answers to, and he would provide a response within 24 hours.  In response, Nicolas sent Mr. Bleckley the following questions:

1.  Requesting VHA Handbook 1147

2.  Requesting Fair Opportunity in Solicitation VA248-17-R-0713 without bias, without discrimination, and without prejudice.

3.  What measures are being taken so to ensure that a fair opportunity will be provided?

4.  What is the current status where my facility currently is in this Solicitation process and based on what facts?

5.  VA required me to put in a fire alarm system in a building I do not own as a requirement when no clarity was provided, a $10,000.00 system has been placed, my hard earned money has been spent to meet what is said to be a requirement and received email from VA that I have passed the requirements and now no one is returning my call. How is this considered fair and how are this putting Veterans first when VA has stated there's a need for the services that my facility provides?

43.      In response to her emailed questions to Mr. Bleckley, Nicolas received an email from Mr. Majors on September 11, 2018 which stated as follows:

As discussed during our recent conversation.  My apology for not responding to your request sooner.  Unfortunately, I was away from the office attending to personal matters.  The following response(s) are provided to your message to Mr. Bleckley, September 10, 2018:

a.      Previously a copy of the referenced handbook (VHA Handbook 1147) was provided.  You questioned the authenticity of the document considering the

conflicting dates in addition to the document being provided in Microsoft Word (ie., .docx) format.   We've attempted to obtain a response from the author/originator of this document but have been unsuccessful.  Because we're not the author/originator of the document we're unable to validate the accuracy of the copy provided.  However, we're confident and optimistic, despite the clerical error addressed, the document provided is current.  The following contact information is provided to further assist you with your request to validate the authenticity and accuracy of the document:

Daniel J. Schoeps, Chief, Community Care Programs, VHA, (202) 461-6763

b.      On August 28, 2018, our office submitted a written response with regard to your concerns of fair opportunity.   The evaluation of your proposal was accomplished in accordance with the solicitation and common procedure(s).  Based upon the information reviewed I'm unable to ascertain any actions of bias or prejudice in the evaluation of your proposal.

c.      As addressed above in para b, your firm received "fair opportunity" through evaluation of your offer in accordance with the terms and conditions of solicitation VA248-17-R-0713.  Please be advised this solicitation has closed and no additional offers are being accepted in response to the referenced solicitation.  However, we are in the process of issuing a new solicitation for similar services and recommend, if your firm has continued interest, that your firm submit a new proposal when the solicitation is issued.

d.      No further actions will be taken in regard to your offer/proposal.  As stated above, a new solicitation will be issued and recommend, should you desire, to submit a new offer once the solicitation has been issued.

e.      In regard to your concern with direction given to members of your firm, any remedy to resolve this concern must be addressed in accordance with FAR Part 33 procedures, as applicable, or through other legal remedies that may be available to your firm.

I would like to personally thank you for your interest with doing business with the Veterans Health Agency (VHA) and hope that you will have a continued desire to provide services to our nations Veterans.  Should you have additional concerns and/or questions please don't hesitate to contact us.

44.      After receiving Mr. Majors' response, which was a complete failure to address her concerns, and went as far as trying to validate Handbook 1147.1 by directing her to the very person who told her it was not a valid document.  Nicolas received a call from VA Contracting Officer Jonathan Locklear.  Nicolas discussed the situation with Mr. Locklear, stating that she was waiting

16

on further explanation as she had phone conversations with the Mr. Majors and Mr. Bleckly that were contradictory to the email explanation that Mr. Majors sent. Nicolas further stated that she was giving them time to explain what discrimination is and what is not discrimination, based on what she has experienced and has been told. In response Mr. Locklear told her, "its not like your situation is normal because you have already invested to take care of veterans. You have already taken your money out of your company to take care of concerns that may have not even needed to be addressed." Nicolas asked Mr. Locklear, "why are my requirements so different then everyone else?" To which her responded, "I can't answer that." He further said, "You are a day care, there are no medical requirements." "I know your facility is safe, you have licenses and insurance." Nicolas then asked how she would know if a final determination had been made with respect to the Solicitation as the VA had not followed the standard procedure. Mr. Locklear told her, "I don't know you have been given a formal determination. No one is willing to tell you what has taken place and where you stand."

45.     Thereafter, Nicolas made contact with Executive Director VHA Regional Procurement Office East, Joseph Maletta. Mr. Maletta explained to Nicolas that he had reviewed the Solicitation and all the information provided. He had an independent team review everything submitted, and he concurred with Nicolas that there "were some errors" in the memorandum Mr. Majors has sent to her. Mr. Maletta informed Nicolas that a new Solicitation was going out in October of 2018 and that "the team has to demonstrate to me how they are going to get all the information correct." Mr. Maletta further stated, "I am confident the next time around we will get this correct. Obviously, this opens up questions to the team regarding the awards that were made. None the less, I want to apologize. I do not think we handled this the right way, and we will get it right the next time." Despite, Mr. Maletta's assurances, a new Solicitation has never been posted.

Simply put there would never be a situation where the WPB VA would ever approve the Solicitation being awarded to Plaintiffs no matter what they did.

**COUNT ONE:**
**VIOLATION OF CIVIL RIGHTS**
**(42 U.S.C. § 1981)**

46.     Plaintiffs repeat, reallege and adopt paragraphs 1 through 45 above as if fully set forth herein.

47.     The VA has engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting, which is illegal under § 1981.  Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

48.     African Americans are a protected class under § 1981.  WWHS is a member of that class because it is a 100% African American owned healthcare provider.  Additionally, Nicolas is a member of that class being African American.

49.     As alleged herein, WWHS and Nicolas attempted to contract with the VA for providing adult day care services to veterans, but the VA refused, providing a series of phony excuses.  Yet, the VA has continued to contract with and make itself available to contract with similarly situated white-owned adult day care facilities.

50.     The VA has refused to contract with WWHS and Nicolas for adult day care services.  The VA has a pattern and practice of refusing to do business, or offering unequal contracting terms to, African American owned healthcare providers.

51.     But for VA's refusal to contract with WWHS, WWHS would have received a guaranteed contract for five years that would have resulted in millions of dollars in revenue.

Moreover, contracting with the VA would have resulted in increased growth and opportunities for WWHS which would have resulted in additional revenue.

52.     Based on the revenue WWHS would generate if the VA contracted with them in good faith, would be valued at approximately $11 million.

53.     Accordingly, the VA's unlawful discrimination has caused WWHS in excess of $11 million in damages, according to proof at trial; plus, punitive damages for intentional, oppressive and malicious racial discrimination.

**COUNT TWO:**
**BREACH OF IMPLIED-IN-LAW CONTRACT**
**(Violation of the Tucker Act)**

54.     Plaintiffs repeat, reallege and adopt paragraphs 1 through 45 above as if fully set forth herein.

55.     The VA required Plaintiffs to purchase and install an unnecessary and redundant fire alarm system as a condition to being awarded the contract for services under the Solicitation. The VA, through its Contracting Officers, made promises to Plaintiffs that once the fire alarm system was installed, they would be awarded the contract, which created a ratified unauthorized commitment and an implied contract.

56.     Plaintiffs acquiesced to the VA's request and installed the fire alarm system at a cost of $10,000.00.

57.     The VA confirmed to Plaintiffs that they were satisfied with the fire alarm system that was installed.

58.     Subsequently, the VA breached the contract and failed to award Plaintiffs under the Solicitation.

59.     As a result of the VA actions, Plaintiffs have suffered substantial damages in the form of $10,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

(a)     Plaintiffs WWHS and Nicolas pray for compensatory, general and special damages from the VA in excess of $11 million according to proof at trial;

(b)     Plaintiffs WWHS and Nicolas pray for injunctive relief prohibiting the VA from discriminating against African American–owned adult day care providers, including WWHS, based on race in connection with contracting for adult day care services;

(c)     Plaintiffs WWHS and Nicolas pray for an award for punitive damages for the VA's oppressive and malicious conduct;

(d)     Plaintiffs WWHS and Nicolas pray for an award of attorneys' fees, costs, and interest; and

(e)     Plaintiffs WWHS and Nicolas pray for such other and further relief as the Court deems just and proper.

Dated: May 13, 2019

Respectfully Submitted,

/s/ Scott D. Hirsch
Scott D. Hirsch, Esq.
Florida Bar No: 0050833
SCOTT HIRSCH LAW GROUP, PLLC
7301 W. Palmetto Park Road, Ste. 207A
Boca Raton, FL 33433
Tel.:    (561) 569 -7062
Scott.Hirsch@ScottHirschLawGroup.com

Erika D. Rodriguez, Esq.
RODRIGUEZ LAW & ADVOCACY, P.A.

20

7301 W. Palmetto Park Road, Ste. 207A
Boca Raton, FL 33433
Tel.:    (561) 800 - 4177
Erika@RodriguezLawPA.com
Fla. Bar. No.: 1004212